IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SH TOBACCO & CIGARS, LLC, | § | |
| | § | |
| Plaintiff-Counterdefendant, | § | |
| | § | Civil Action No. 3:23-CV-0781-D |
| VS. | § | |
| | § | |
| MASTERS 96TH LLC, | § | |
| | § | |
| Defendant-Counterplaintiff- | § | |
| Third-Party Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| SULAIMAN A. ALHAJRI, | § | |
| | § | |
| Third-Party Defendant. | § | |

<u>MEMORANDUM OPINION</u>

In this removed diversity action involving commercial leased premises that the Landlord claims were being operated impermissibly as a head shop, the remaining claims tried to the court were the counterclaim of defendant-counterplaintiff-third-party plaintiff Masters 96th LLC ("Masters'") against plaintiff-counterdefendant SH Tobacco & Cigars, LLC ("SH Tobacco") for breach of the lease agreement, and a declaratory judgment claim brought by Masters against third-party defendant Sulaiman A. Alhajri ("Alhajri"), as guarantor of the lease. Following a bench trial, and for the reasons that follow,[1] the court

_____

[1]The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). All factual findings are based upon a preponderance of the evidence, which means such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in the court's mind as the trier of fact a belief that what is sought to be proved is more likely true than not true. To prove a claim

finds that SH Tobacco breached the terms of the lease agreement and that Masters is entitled to damages from SH Tobacco and Alhajri, jointly and severally, in the sum of $197,376.86.

I

A

In March 2022 SH Tobacco (as tenant) and Masters (as landlord) entered into a commercial lease ("Lease") for retail space ("Premises") located in a Greenville, Texas shopping center. Alhajri, one of the owners of SH Tobacco, guarantied the Lease.

Section 3 of the Lease consists of a "Purpose" clause that provides, in pertinent part:

> Tenant shall use the Premises solely for a tobacco, cigar, and vape store. In no event shall Tenant use the Premises for a head shop or other establishment selling or exhibiting drug paraphernalia, supplies, products, or other equipment including, but not limited to, rolling papers, roach clips, bongs, pipes, hookahs, needles and small spoons, straws or paper tubes, small mirrors, or razorblades (collectively, the "Prohibited Products"). . . . The sale of any Prohibited Products in the Premises shall constitute an immediate default hereunder and Landlord may, without notice and in addition to any other remedies at law or in equity, terminate the Lease, regain possession of the Premises, and immediately accelerate all rent due hereunder. . . . The Premises shall be used for no other purpose unless approved in writing by Landlord.

D. Ex. 21.

SH Tobacco opened for business in June 2022, doing business as Tobacco Tree Cigars Vape & More. A few months later, during a routine inspection and property visit, Masters discovered that SH Tobacco was advertising cannabidiol ("CBD") and kratom for sale at the

_____

by a "preponderance of the evidence" merely means to prove that the claim is more likely so than not so.

Premises.  Masters believed the sale of these products violated Section 3 of the Lease and notified SH Tobacco in a September 12, 2022 letter that it was in default of the Lease. Masters demanded that SH Tobacco "immediately cease and desist the marketing and sale of CBD, kratom, and any other Prohibited Products at the Premises," and warned that the future marketing or sale of these products would result in SH Tobacco's prompt eviction. D. Ex. 28.

In November 2022 Masters discovered that SH Tobacco was still advertising and offering CBD and kratom for sale at the Premises and that it was also selling other Prohibited Products, such as bongs, pipes, and hookahs.  Masters believed that this conduct violated the Lease and that, under the terms of the Lease, it was entitled to repossess the Premises and take possession of the personal property inside.  Accordingly, in January 2023 Masters arranged for the locks to the Premises to be changed in an attempt to lock SH Tobacco out. After SH Tobacco regained entry to the Premises and continued to operate, Masters super-glued and broke a key in the door to the Premises and placed a concrete barrier in front of the entryway to prevent SH Tobacco from entering.  Masters eventually removed SH Tobacco's property from the Premises and placed it in climate-controlled storage, where it still remains.

B

In March 2023 SH Tobacco sued Masters in state court, alleging a claim under Texas law for "Termination of the Lease Agreement," and seeking damages under Tex. Prop. Code Ann. § 93.002(g) (West 2023).  Masters removed the case to this court and filed a

- 3 -

counterclaim against SH Tobacco for breach of contract and declaratory judgment[2] and a third-party claim against Alhajri for declaratory judgment.

In *SH Tobacco & Cigars, LLC v. Masters 96th LLC* (*SH Tobacco I*), 2024 WL 1687663 (N.D. Tex. Apr. 17, 2024) (Fitzwater, J.), the court granted Masters' motion for summary judgment on SH Tobacco's breach of contract claim, holding that SH Tobacco's undisputed sale of Prohibited Products—i.e., bongs, pipes, hookahs, and other drug paraphernalia—constituted an "immediate default" that gave Masters the right under the Lease to regain possession of the Premises. *Id.* at *4. The court raised *sua sponte* that Masters was also entitled to summary judgment on SH Tobacco's Texas Property Code claim.[3]

As for Masters' breach of contract counterclaim against SH Tobacco, the court held that "evidence that SH Tobacco sold bongs, hookahs, and pipes cannot, without more, create a genuine issue of material fact on Masters' breach of contract counterclaim because Masters has not pleaded a counterclaim based [on] SH Tobacco's sale of these products." *Id.* at *6. But because Masters *had created* a genuine issue of material fact on the question whether SH

_____

[2]In *SH Tobacco & Cigars, LLC v. Masters 96th LLC* (*SH Tobacco I*), 2024 WL 1687663 (N.D. Tex. Apr. 17, 2024) (Fitzwater, J.), the court granted SH Tobacco's motion for summary judgment on Masters' declaratory judgment counterclaim because it was duplicative of Masters' breach of contract counterclaim. *Id.* at *10.

[3]Because the court raised this issue *sua sponte*, it permitted SH Tobacco to file a response. In *SH Tobacco & Cigars, LLC v. Masters 96th LLC*, 2024 WL 3241319, at *1 (N.D. Tex. June 26, 2024) (Fitzwater, J.), the court held that SH Tobacco did not create a genuine issue of material fact with respect to its claim for violation of Tex. Prop. Code Ann. § 93.002(c) and granted summary judgment in Masters' favor on this claim.

Tobacco breached the Lease by advertising and selling CBD and kratom at the Premises, the court held that neither SH Tobacco nor Masters was entitled to summary judgment with respect to Masters' breach of contract counterclaim. *Id.* at *7-8. The case proceeded to a bench trial on the remaining claims: i.e., Masters' breach of contract counterclaim against SH Tobacco and its third-party declaratory judgment claim against Alhajri.

II

The court first considers whether Masters has proved by a preponderance of the evidence that SH Tobacco breached the Lease.

A

The question whether SH Tobacco breached the Lease turns on whether SH Tobacco's undisputed sale of CBD, kratom, and kava, in combination with various Prohibited Products, including bongs, hookahs, digital scales, and other products that could be considered "drug paraphernalia, supplies, products, or other equipment," exceeded the permissible use of the Premises—i.e., "solely for a tobacco, cigar, and vape store"—and converted it into a "head shop." D. Ex. 21. The court finds that it did.

When interpreting a contract under Texas law, the court's "primary objective is to ascertain the parties' true intentions as expressed in the language they chose." *Rieder v. Woods*, 603 S.W.3d 86, 94 (Tex. 2020) (quoting *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015)). While the court "construes [the] contract in a manner that gives effect to the parties' intent expressed in the text," it may also "take into account the facts and circumstances surrounding the contract's execution." *Id.* (internal

quotation marks omitted) (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)); *see also Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469-70 (Tex. 2011) ("As we have said, '[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole.'" (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977)).

B

The Lease negotiations in this case do not suggest that the parties intended to permit SH Tobacco to sell CBD, kava, or kratom at the Premises. When SH Tobacco inquired about leasing one of Masters' properties for a "Smoke/Vape Shop," Masters asked SH Tobacco to provide it with photos of its existing stores so that Masters could "ensure that [t]he store is to the level of build-out that [it] will require for this type of use." D. Ex. 4. SH Tobacco responded with photos of its current stores, to which Masters replied:

> Per the highlighted language below, we do not allow ANY drug paraphernalia including, but not limited to, hookahs, bongs, pipes, water pipes, etc. If you can operate your business without this "glassware" and with this prohibited language in place in your lease, please let me know.

*Id*. Sam Rakib Mohamed responded on behalf of SH Tobacco: "I will operate on my business as u said . . . *only tobacco leaf with vapes and cigarettes* and some Accessories phones." *Id.* (emphasis added). SH Tobacco did not request permission to sell CBD, kratom,

- 6 -

or kava,[4] and, in fact, represented to Masters that it would *only* sell tobacco leaf, vapes, and cigarettes in addition to some phone accessories.

In relation to SH Tobacco's potential lease of two *different* properties, both located in Oklahoma, Masters provided the following proposed "prohibited use" language:

> The Leased Premises shall be used for **A TOBACCO, VAPE AND CBD STORE**, and for no other purpose. . . .  In no event shall Tenant use the Leased Premises for a head shop or other establishment selling or exhibiting drug paraphernalia, supplies, products, or other equipment including, but not limited to, rolling papers, roach clips, bongs, pipes, hookahs, needles and small spoons, straws or paper tubes, small mirrors, or razorblades (the "Prohibited Products").

D. Ex. 6.  In the Lease that the parties ultimately signed for the Greenville, Texas store, however, Masters did *not* include this same language.  Instead, in what the court will refer to as the "Use Restriction," the Lease provides that "[t]enant shall use the Premises solely for a tobacco, cigar, and vape store." D. Ex. 21.  The Use Restriction does not mention CBD, and even though SH Tobacco was provided the Lease's Use Restriction language before it signed the Lease, SH Tobacco never requested that any such language be added.  *See* Tr. 45[5] (Masters' senior leasing representative testifying that there was never "any mention,

---

[4]Abobaker Mohamed ("Mohamed"), one of SH Tobacco's managing members, testified at trial that he and Andrew Hasbrook ("Hasbrook"), the senior leasing representative for Masters, discussed SH Tobacco's desire to sell CBD and that Hasbrook sent him a list of locations where he could operate his business with tobacco, cigars, and CBD.  But he did not testify that he and Hasbrook ever discussed the sale of CBD at the Greenville, Texas location or that Masters ever represented that SH Tobacco was permitted to sell CBD there.

[5]Citations to "Tr." are to an unofficial trial transcript.

discussion, anything about SH Tobacco wanting to sell CBD products, kratom products, or kava products" during Masters' discussions with SH Tobacco leading up to the final Lease).

In addition to the Use Restriction, the Lease also prohibits SH Tobacco from using the Premises as a "head shop or other establishment selling or exhibiting drug paraphernalia, supplies, products, or other equipment." D. Ex. 21. At trial, Masters presented evidence that the term "head shop" is a widely-used term within the retail shopping center industry that refers to a store that sells items such as hookahs, bongs, pipes, and other products that are consistent with recreational drug use, often in addition to tobacco products.[6] Masters presented evidence that when products such as CBD and kratom are sold at a store in addition to bongs, pipes, and hookahs, the sale of this combination of products would classify the store as a head shop. SH Tobacco did not present persuasive evidence that SH Tobacco was not operating the Premises as a head shop.

Abobaker Mohamed ("Mohamed"), a managing member of SH Tobacco, testified at trial that CBD and kratom are ingredients in a vape cartridge, and that he believed that because SH Tobacco was permitted to use the Premises as a vape store, the sale of CBD and kratom was also allowed. Mohamed admitted, however, that SH Tobacco did not *only* sell CBD as an ingredient in vape cartridges. He acknowledged that SH Tobacco also sold CBD in other forms, such as "gummies."

SH Tobacco also presented the testimony of a private investigator, Daniel Rutledge

---

[6]SH Tobacco's attorney asserted during trial that he does not know what a head shop is, but SH Tobacco does not argue that the term "head shop" is ambiguous.

("Rutledge"), who visited 20 stores in Greenville and the surrounding area and observed that 19 sold CBD products, 17 sold kratom, and 3 sold kava. But evidence that other stores in the Greenville area sold CBD, kratom, and kava does not control whether *SH Tobacco* was operating the Premises in violation of the Lease. This is because the Lease specifically prohibited SH Tobacco from operating the Premises as a "head shop." Even assuming that CBD, kratom, and kava are typically found in a "tobacco, cigar, and vape store," Rutledge did not testify that the other Prohibited Products (i.e., bongs, pipes, and hookahs), which SH Tobacco undisputedly sold, are also typically found in a tobacco, cigar, and vape store.

Accordingly, the court finds that Masters has proved by a preponderance of the evidence that SH Tobacco breached the Lease by selling a combination of products—CBD, kratom, and kava along with bongs, pipes, and hookahs—that exceeded the permissible use of the Premises and amounted to using the Premises as a "head shop."[7]

---

[7]The court's decision today is not inconsistent with its holding in *SH Tobacco I* that "evidence that SH Tobacco sold bongs, hookahs, and pipes cannot, *without more*, create a genuine issue of material fact on Masters' breach of contract counterclaim because Masters has not pleaded a counterclaim based [on] SH Tobacco's sale of these products," *SH Tobacco I*, 2024 WL 1687663, at *6 (emphasis added), or its holding in *SH Tobacco & Cigars, LLC v. Masters 96th LLC*, 2024 WL 4376161 (N.D. Tex. Oct. 2, 2024) (Fitzwater, J.), that Masters could not amend its counterclaim to add allegations that SH Tobacco breached the Lease by selling "Prohibited Products," *id.* at *1. This is because in *SH Tobacco I* the court left open the possibility that Masters could prove its breach of contract counterclaim through evidence that, "by selling and exhibiting CBD and kratom, SH Tobacco 'established a head shop,' in violation of the Lease," *SH Tobacco I*, 2024 WL 1687663, at *7 (footnote omitted), and because Masters proved at trial that the combination of products that SH Tobacco sold—tobacco, CBD, kratom, and kava, in addition to bongs, hookas, pipes, and other "Prohibited Products"—constituted using the premises as a head shop, in violation of the Lease.

III

Having concluded that SH Tobacco breached the Lease, the court next considers the amount of damages to which Masters is entitled and for which Alhajri is liable as guarantor of the Lease.

A

Under Texas law, "[t]he universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484, 485-86 (1952)). "The normal measure in such cases is the benefit of the bargain, which seeks to place the injured party in the economic position it would have been in had the contract been performed." *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc*., 68 F.4th 206, 217 (5th Cir. 2023) (quoting *Tex. Ear Nose & Throat Consultants, PLLC v. Jones*, 470 S.W.3d 67, 79 (Tex. App. 2015, no pet.)). "This general measure of damages[, however,] is subject to any agreement that the parties might have made with respect to damages because parties to a contract are free to limit or modify the remedies available in the event of a breach." *TODCO Americas, Inc. v. El Paso Óleo e Gás do Brasil, Ltda*., 2009 WL 10697535, at *4 (S.D. Tex. July 17, 2009) (citing *GT & MC, Inc. v. Tex. City Refin., Inc*., 822 S.W.2d 252, 256 (Tex. App. 1991, writ denied)). Regarding damages, Section 3 of the Lease provides:

- 10 -

> The sale of any Prohibited Products in the Premises . . . shall constitute an immediate default hereunder and Landlord may, without notice and in addition to any other remedies at law or in equity, terminate the Lease, regain possession of the Premises, and immediately accelerate all rent due hereunder.  In addition to the foregoing, Tenant shall indemnify, hold harmless, and defend Landlord from any and all costs, including but not limited to reasonable attorney's fees, fines, liens, claims, losses, expenses, and damages to either persons or property arising out of or in any way connected to Tenant's violation of this Section 3.

D. Ex. 21.

### B

Masters proved at trial that it incurred monthly losses for rent, common area maintenance charges, insurance, and taxes for each month following the January 2023 lockout.  SH Tobacco does not dispute the amounts that Masters claims or that Masters is entitled to recover them as damages for its breach of contract counterclaim.  SH Tobacco does, however, contend that Masters is not entitled to recover unpaid rent and related charges for the *entire* Lease term, i.e., through May 31, 2027, asserting as an affirmative defense that Masters failed to mitigate its damages.[8]

"A plaintiff alleging breach of contract cannot recover damages that could have been avoided by the plaintiff's 'reasonable efforts.'"  *Old Republic Gen. Ins. Corp. v. Martin Marietta Materials, Inc.*, 2018 WL 2417851, at *3 (N.D. Tex. May 29, 2018) (Scholer, J.) (quoting *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex.

---

[8]Alhajri asserts the same affirmative defense to Masters' third-party claim.

1995)).  When "a party is entitled to the benefits of a contract and can save [itself] from the damages resulting from its breach at a trifling expense or with reasonable exertions, it is [its] duty to incur such expense and make such exertions." *Great Am. Ins. Co.*, 908 S.W.2d at 426 (quoting *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex. 1936)).  "A party raising such failure-to-mitigate defense must prove (1) the other party could have mitigated its damages but failed to do so due to a lack of diligence; and (2) the amount by which the damages were increased as a result of [the other party's] failure to mitigate." *Bexar Cnty. Hosp. Dist. v. Schindler Elevator Corp.*, 2020 WL 4720091, at *2 (W.D. Tex. June 8, 2020) (citing *Great Am. Ins. Co.*, 908 S.W.2d at 426; *Kartsotis v. Bloch*, 503 S.W.3d 506, 522 (Tex. App. 2016, pet. denied)).

Andrew Hasbrook ("Hasbrook"), the senior leasing representative for Masters, testified that after Masters locked SH Tobacco out of the Premises, Masters took steps to re-lease the premises by listing the property on its website and the websites of other companies that advertise retail shopping centers and by contacting potential tenants and receiving potential inquiries.  Despite these efforts, the Premises have not been re-leased and remain vacant today.  Hasbrook testified that 20 months without a new tenant is "typical" in the industry, Tr. 48, and that it usually takes between 18 and 24 months "to go from a vacant space that's unplanned vacancy to a re-leasing," *id.* at 49.  SH Tobacco failed to produce any evidence that persuades the court to find that Masters did *not* act with diligence in attempting to re-lease the Premises.  Nor did SH Tobacco meet its burden to prove the amount by which Masters' damages were increased as a result of its failure to re-lease the Premises.

- 12 -

Accordingly, the court holds that SH Tobacco is not entitled to any reduction in the amount of damages it owes for unpaid rent based on its failure-to-mitigate defense. *See Cole Chem. & Distrib., Inc. v. Gowing*, 228 S.W.3d 684, 688 (Tex. App. 2005, no pet.) ("[W]here a defendant proves failure to mitigate but not the amount of damages that could have been avoided, it is not entitled to any reduction in damages." (citing cases)); *Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 928 S.W.2d 56, 62 (Tex. App. 1995, pet. granted) ("Regency proved that Bingo failed to mitigate its damages. Regency, however, never offered any testimony or proof on how much Bingo's damages increased because of its failure to mitigate. Therefore, Regency failed to meet its burden of proof."), *aff'd in part, rev'd in part on other grounds*, 936 S.W.2d 275 (Tex. 1996).

Nor is SH Tobacco entitled to any reduction in damages based on Hasbrook's testimony that "he would expect to see that an available space would start producing revenue within about 32 months." Tr. 127. This is because, not only has SH Tobacco failed to provide any evidence that Masters will likely re-lease the Premises within 32 months after the lockout, it has failed to prove the amount by which Masters' losses would actually be mitigated if it did re-lease the Premises. *See Cole Chem. & Distrib., Inc.*, 228 S.W.3d at 688; *Regency Advantage Ltd. P'ship*, 928 S.W.2d at 62.

Accordingly, the court finds that, to the extent that SH Tobacco seeks to limit the amount of unpaid rent and related charges that Masters can recover based on its failure to re-

lease the premises, i.e., to mitigate its damages,[9] SH Tobacco has not met its burden of proof.[10]

C

Masters also seeks to recover the costs it incurred in connection with the lockout, the removal of SH Tobacco's property from the premises, the storage of SH Tobacco's property, and the preparation of the Premises for re-leasing. Again, aside from its evidentiary objections,[11] SH Tobacco does not dispute any of the amounts that Masters claims or that, under the Lease's terms, Masters is entitled to recover the costs it incurred "arising out of or in any way connected to [SH Tobacco]'s violation of . . . Section 3" of the Lease. D. Ex. 21. SH Tobacco instead argues that Masters had a duty to dispose of SH Tobacco's property in a "commercially reasonable time," and that, had it done so, it could have credited the sales

_____

[9]The court assumes *arguendo* that Masters had a duty to mitigate its damages. It notes, however, that Masters had a right to accelerate all rent due under the Lease, and at least one Texas court has held that "[a]pplication of the doctrine of avoidable consequences . . . would, in effect, nullify this contractual remedy." *Shasteen v. Mid-Continent Refrigerator Co.*, 517 S.W.2d 437, 440 (Tex. Civ. App. 1974, writ refused n.r.e.); *but cf. Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 967 (N.D. Tex. 1995) (Fitzwater, J.) ("Under Texas law, a landlord is obligated to mitigate his damages. Thus a simple acceleration of future rents may not be a proper measure [of damages]"); *Sw. Park Outpatient Surgery Ltd. v. Chandler Leasing Div.*, 572 S.W.2d 53, 56-57 (Tex. Civ. App. 1978, no writ) (simple acceleration of rents without crediting lessee for resale or re-letting of property violates just compensation and is void as penalty).

[10]Nor did Alhajri meet this burden of proof as to his affirmative defense of failure to mitigate damages.

[11]SH Tobacco objected at trial to Masters' Exhibit 56, which contains a summary of expenses Masters incurred in connection with the lockout and removal of property from the Premises. Although the court sustained SH Tobacco's objection to Ex. 56, it later admitted, without objection, Masters' Exhibit 70, which contains evidence of these same costs.

- 14 -

proceeds to SH Tobacco and avoided the storage fees it incurred.

At trial, SH Tobacco cited *Myers v. Ginsburg*, 735 S.W.2d 600 (Tex. App. 1987, no writ), for the proposition that "if a landlord exercises its lien rights and repossesses property . . . it must dispose of that property in a commercially reasonable time and credit those sale proceeds to the tenant." Tr. 24.[12]  But as Masters points out, this was not Masters' obligation under the Lease.  The Lease provides, in Section 38, that if Masters terminates the Lease because of an "Event of Default," it may recover, *inter alia*, its "reasonable costs and expenses . . . paid or incurred by Landlord from time to time in connection with . . . Removal *and storage* of Tenant's or other occupant's property." D. Ex. 21 (emphasis added).  In other words, Masters was not obligated to sell SH Tobacco's property after the lockout; it had a contractual right to store it and recover from SH Tobacco the cost of storage.

Even assuming *arguendo* that Masters *did* have an obligation to sell SH Tobacco's property in a commercially reasonable amount of time, SH Tobacco has not proved the amount by which Masters' damages were increased as a result of its failure to do so.  *Cole*

---

[12]The court in *Myers* stated:

> With regard to foreclosure of other types of liens on chattels, the person holding the security interest must not only credit proceeds and pay surplus but must also conduct a sale within a commercially reasonable time.  This requirement derives from the common law rule, applicable to all contracts, including leases, that an injured party has the duty to mitigate his damages.

*Myers*, 735 S.W.2d at 605 (citations omitted).

*Chem. & Distrib., Inc.*, 228 S.W.3d at 688; *Regency Advantage Ltd. P'ship*, 928 S.W.2d at 62. Although Mohamed testified that he thought the inventory was worth about $200,000 at the time of the lockout in January 2023, SH Tobacco produced no evidence of what amount Masters could have sold the property for had it conducted a sale. SH Tobacco only speculated that Masters could have sold SH Tobacco's inventory in another of its stores, but provided no evidence to substantiate this assertion or to prove the amount it would have obtained and saved (i.e., storage costs) by doing so.

D

In its Exhibit 70, which the court admitted without objection, Masters includes in its requested damages $210 in returned check charges and $4,350 in late fees. But Masters did not prove at trial that it was entitled to recover either of these amounts under the terms of the Lease or Texas law. Accordingly, because Masters did not meet its burden with respect to these damages amounts, the court declines to award them.

Masters seeks a total of $201,936.86 in damages. The court subtracts $4,560 from this amount, and finds that Masters is entitled to recover the remaining sum of $197,376.86 in damages for SH Tobacco's breach of the Lease agreement.

IV

Masters established at trial that defendant Alhajri signed the guaranty attached to the Lease and that SH Tobacco and Alhajri, as guarantor, are liable to Masters for damages. The court accordingly finds in Masters' favor on its declaratory judgment claim against Alhajri and holds that Alhajri is jointly and severally liable for the damages awarded today.

- 16 -

\*   \*   \*

In sum, for the reasons explained, with respect to the remaining claims tried in the bench trial, the court will file today a judgment in favor of Masters on its breach of contract counterclaim against SH Tobacco and its declaratory judgment third-party claim against Alhajri, jointly and severally, in the sum of $197,376.86.

November 22, 2024.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

- 17 -